## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

MERIT CONSTRUCTION ALLIANCE,
   et alia

       Plaintiff

v.                                                    Civil Action No. 12-10458 RWZ

CITY OF QUINCY

       Defendant

---

## DEFENDANT CITY OF QUINCY'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRELIMINARY RELIEF

      The plaintiffs in this action for declaratory and injunctive relief seek a preliminary order, enjoining the city of Quincy ("Quincy") from proceeding with a bid opening for a major public works project.[1]  They seek this order because all bidders have been directed to comply with certain provisions of a municipal ordinance regarding employment conditions - which provisions the plaintiffs assert to be unlawful.  Quincy opposes the motion for the preliminary order for reasons more fully discussed in this memorandum.

      In pressing for relief, plaintiffs rely upon, and essentially re-assert, arguments addressed in this court's recent ruling in *UCANE v. Fall River*.[2]  This memorandum will discuss why Quincy's presence before the court – just five short months after its *Fall*

---

[1] The city is constructing a new middle school – slated to open in the fall of 2013.
[2] Civil Action No. 10-10994 RWZ.  Reference to this decision shall hereinafter be denoted *UCane v. Fall River at* ___.

*River* ruling – is far more than what might appear to be a mere manifestation of political intransigence. There exist significant differences between the ordinances and the facts in each case, which together militate against the granting of the relief requested.


BACKGROUND

In November of 2010, the Massachusetts School Building Authority ("SBA") voted to approve Quincy's participation in its model school program – a vote which provided the means for Quincy to construct a badly-needed middle school, funded by a combination of state and city funds, in a cost-efficient and timely manner. Affidavit of Thomas P. Koch at ¶ 12 . Quincy officials have been working on the project for over two years. Last September, Quincy concluded a pre-qualification process for contractors that resulted in the pre-qualification of the two corporate plaintiffs in this case. Affidavit of Kathryn Hobin at ¶ 4.[3] They complain that the city's Responsible Employer Ordinance ("REO") impairs certain constitutionally-protected rights, and/or is preempted in whole or in part by a federal regulation that governs employee compensation. Complaint at ¶ 1.

The ordinance, a copy of which is attached to the Complaint as Exhibit A, was passed in June of 2010. Affidavit of Thomas P. Koch at ¶ 7. Quincy engaged in a two-year review of its existing ordinance, arising out of its experience with the construction of a new Quincy High School, beginning in 2008. That experience included a labor dispute involving a plaintiff in this action – D'Agostino – who was the successful low bidder on the masonry work for the school. Affidavit of Thomas P. Koch at ¶¶ 3 and 7. Several

---

[3] None of the plaintiffs complained about the ordinance that is the subject of this action during the pre-qualification process, or upon receiving notice that they qualified. Affidavit of Kathryn Hobin at ¶ 4.

companies and union officials challenged whether D'Agostino was a responsible bidder, and sought to have his low bid thrown out. The city investigated and rejected the claim, and then participated in a bid protest hearing during which it essentially defended D'Agostino's right to perform the work. Affidavit of Thomas P. Koch at ¶ 4.

During this experience, the mayor became aware of, and concerned about, the city's REO. He appointed a committee that studied the ordinance over the succeeding two years, resulting in the ordinance passed in its present form. Affidavit of Thomas P. Koch at ¶ 7.

Quincy had a unique interest in its labor force at the time, as it was in the process of negotiating a $1.6 Billion dollar agreement with a company to oversee the redevelopment of the city's downtown. Affidavit of Thomas P. Koch at ¶ 8. With that project, and the pending Central Middle School project in mind, the mayor had distinct concerns about the availability of skilled, trained workers in the coming years. Affidavit of Thomas P. Koch at ¶¶ 8, 9.

The apprentice training requirement found at Section 15.26.010 (C) of the newly revised ordinance is reflective of that concern – and reflective of Quincy's recognition of the parameters applicable to such regulation. Importantly, notwithstanding its significant partnership/involvement in the downtown redevelopment, Quincy limited its apprentice training requirement to public works projects only – i.e, projects in which the city is a direct participant as owner, only. Affidavit of Thomas P. Koch at ¶ 8.

In addition, the mayor was aware that the city would be building a new Central Middle School, as the Quincy High School project was underway, and prior administrations had committed to its construction. This school is badly needed, and its

3

delivery cannot be delayed; for this reason, the city was granted admission to the SBA's

model school program, allowing it to proceed on a fast track process, saving both time

and money.  Affidavit of Thomas P. Koch at ¶ 9.

Plaintiffs presented their complaint to the court on the day that filed sub-bids were

to be opened, complaining about an ordinance that they have known about since at least

September of last year.  Affidavit of Kathryn Hobin at ¶ 4.  Copies of each corporate

plaintiff's certification of compliance with that ordinance, received by the city prior to

September 22, 2011 – when all prequalified companies were notified – are attached

hereto as Exhibit A.  By their own admission, they first called their concerns to the

attention of the city on March 1, 2012 – fully six months after they first became aware of

the ordinance and its provisions.  Complaint at ¶ 33.

For these reasons alone, the plaintiffs attempt to delay this project at the eleventh

hour should summarily be denied.  Moreover, given the manner in which Quincy

narrowly crafted the challenged ordinance provisions, and its unique interest in the

marketplace in which it is participating as a municipal corporation engaging in public

works projects, the state of the law is such that the extraordinary relief sought by the

plaintiffs is not warranted – all as discussed more fully, below.


LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *Monsanto Co. v. Geertson
Seed Farms,* 130 S.Ct. 2743, 2761 (2010).  To obtain this extraordinary relief, plaintiffs

must show that: (1) they will suffer irreparable harm absent an injunction; (2) the injury

outweighs the harm to the defendants if granted; (3) they are likely to succeed on the

merits of the case, and (4) the injunction does not adversely affect the public interest.

*Planned Parenthood League of Mass. v. Bellotti* , 641 F.2d 1006, 1009 (1st Cir. 1981).

DISCUSSION OF APPLICABLE LEGAL PRINCIPLES

I.   THE CITY OF QUINCY ORDINANCE REQUIRING RESIDENCY
     PARTICIPATION IN EMPLOYMENT DOES NOT VIOLATE ANY
     CONSTITUTIONAL PROVISIONS.

A. Summary of issue

Plaintiffs argue it is unconstitutional for Quincy to require that contractors
working in the city on public works projects employ "qualified workers who are
residents" in a proportion of thirty-three percent for each apprenticable trade or
occupation, claiming it violates the privileges and immunities clause of Art. IV, § 2, of
the Constitution ("Privileges and Immunities Clause").  In pressing their argument,
plaintiffs wisely and efficiently rely almost wholly on the decision of this court in *UCane
v. Fall River.*   Such reliance is inapposite.

As explained more fully below, Fall River presented no underlying reasons for its
residency requirement in *UCane* – as Quincy does here.  Those reasons more than
establish that Quincy's substantial interest in its residents' employment  is the legitimate
rationale for this ordinance, which is tailored to meet that rationale, only.  The city does
not seek to exclude non-residents from working on its projects; it in fact leaves a
substantial percentage of the work opportunity to the discretion of contractors.

Moreover, for those contractors who cannot meet the ordinance requirement, there
is a unique provision that allows the contractor to continue to work, so long as it

5

establishes that it made a "best effort" to meet the residency threshold.   Complaint

Exhibit A at p. 8.  Affidavit of Kathryn Hobin at ¶¶ 7, 8.

Thus, the Quincy ordinance is substantially different from that of Fall River –

which required that "100 percent of the apprentices and fifty percent of all other workers"

be Fall River residents.  *UCane v. Fall River* at 9.   For these reasons, the Quincy

residency requirement is not violative of the Privileges and Immunities Clause.  Plaintiffs

cannot, therefore, clear the "likelihood of success" bar at this juncture, and their request

for extraordinary relief must be denied.


B. The *UCane v. Fall River* decision never addressed the second-prong of the two-part *Toomer* test, as Fall River opted not to present that issue to the court.

First, this court analyzed the Fall River ordinance by applying the so-called

*Toomer* test – a two-pronged analysis first enunciated by the Supreme Court in its 1948

decision, *Toomer v. Witsell,*  (334 U.S. 385, 396 [1948]).  The analysis requires a

reviewing court to determine whether (1) the alleged discriminatory act impairs one of

the privileges protected under the clause; and (2) there exists a substantial reason for the

treatment, and if such reason exists, whether the treatment bore a substantial relationship

to the underlying objectives – shifting the burden to the government actor on the second

prong.  *UCane v. Fall River* at 9, *citing, Toomer v. Witsell* 334 U.S. at 396.

In performing its analysis, however, this court made quite clear that the *UCane*

record did "not advance any substantial justification for the discriminatory ordinance"

and therefore only analyzed whether the Fall River ordinance "burdened a recognized

protection under the Privileges and Immunities Clause."  Id.  Quincy accepts the

conclusion of that first-prong analysis – and acknowledges for purposes of this motion that pursuit of a livelihood is a fundamental right within the purview of the clause.

However, as explained by the Supreme Court, "the privileges and immunities clause is not an absolute. …[I]t does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it." *Toomer v. Witsell,* 334 U.S. at 396. This court did not analyze the "substantial reason" prong in *UCane* because Fall River opted, for perfectly understandable reasons, not to press it.

Quincy seeks such an analysis, however, as its residency ordinance is precisely the sort of scenario contemplated by the *Toomer* court when it spoke of the "many situations" where disparate treatment might be "perfectly valid." In addition, the ordinance contains a unique clause that clearly shows Quincy intended to narrowly tailor the requirement to fit the underlying objective.

C. Applying the *Toomer* analysis to Quincy

Quincy is uniquely positioned as a municipal corporation, due to its current commitment to a $1.6 Billion dollar public works contract in its downtown, and its participation in various public works projects, such as the one at issue here – the construction of a badly needed middle school.

Given these circumstances, Mayor Koch made it a priority in 2008 to review the city's REO, including its provision regarding residency. Concurrent with this review, the mayor was hearing from the citizenry on an almost daily basis that the "blue collar" sector of our city needs work – as is the case across the country. Affidavit of Thomas Koch at ¶ 10. This fact, in combination with his knowledge that the city's taxpayers would be paying millions of dollars for the construction of a new middle school (the

number turned out to be $17 Million); and, tens of millions of dollars in a billion dollar
downtown project, caused the mayor to direct the review committee to include a narrowly
crafted residency provision.  Affidavit of Thomas Koch at ¶¶ 11.

The provision ultimately enacted provides that a contractor employ a work force
that includes 33% Quincy residents.  The ordinance includes a clause that allows those
with an existing labor force – who would be clearly burdened by this requirement – to
certify in writing to the city's purchasing agent that compliance is due to the company not
hiring, and if it were in the future, it would make a good faith effort to secure Quincy
residents.  Affidavit of Kathryn Hobin at ¶ 7.

It is virtually axiomatic that every municipality would wish to see its citizens
employed, and would do whatever it could to insure that happens.  That desire, however,
must be balanced against the federal interest in "plac[ing] the citizens of each State upon
the same footing with citizens of other States, so far as the advantages resulting from
citizenship in those States are concerned.  *Paul v. Virginia,* 8 Wall. 168, 180 (1869).

Quincy has sought to recognize that balance, while insuring that its taxpayers,
who are embarking over the next decade on a multi-million dollar investment in their
community – some private work, some public work – see some return on their
substantial, and unique, investment in the way of jobs.  That Quincy distinguished in its
ordinance between the public and private work – limiting its preference to those jobs
where the city is a market participant – is a very significant factor.

For example, the Supreme Court upheld as a lawful exercise of power  a 50%
residency requirement in *White v. Mass. Council of Construction Employers*, 460 Mass.

204 (1983). There, the court found that – like Quincy – the city was acting as a market participant; it was not regulating the marketplace, but was instead spending city funds.

This important distinction, and Quincy's unique position in the construction marketplace, mandate the same outcome. Its residency preference is a lawful exercise of its police power, narrowly tailored to address its activity in the public works marketplace. Under long-established case law interpreting such regulations, the enforcement of this provision on this project should not be enjoined.

II.   THE CITY OF QUINCY ORDINANCE REQUIRING APPRENTICE TRAINING PROGRAMS IS LAWFUL, AND NOT SUBJECT TO FEDERAL PRE-EMPTION.

In analyzing the apprentice requirement of Fall River's ordinance in *UCane,* this court applied the concept of preemption broadly, following the guidance of the Supreme Court as enunciated in *FMC Corp. v. Holliday,* (498 U.S. 52 [1990])("The preemption clause is conspicuous for its breadth.")   The *UCane* analysis does not address whether state apprentice programs are preempted by ERISA, concluding that "the court need not engage in a prolonged 'relates to' analysis because the pension, healthcare and apprenticeship provisions of the 2010 [Fall River] REO are all mandatory requirement provisions." *UCane v. Fall River* at 12 (citations omitted).  This court found that "[s]uch an apprenticeship program mandate is preempted by ERISA[]" citing *Minnesota Chapter of Associated Builders & Contractors, Inc. v. Minnesota Dep't of Pub. Safety,* 267 F. 3d 807 (8th Cir. 2001).

Quincy's ordinance also mandates an apprentice program.  Thus, were the *UCane* analysis to be followed, the inquiry would stop here, and that mandate would be adjudged unlawful.  Quincy asks the court to revisit the issue, however, for the reasons that follow.

Prior to that discussion, however, Quincy respectfully refers to the concurring opinion of Justice Scalia, who was joined by Justice Ginsburg, in the seminal *Dillingham* decision, discussed below.  Addressing the numerous certiorari petitions the court had accepted to date regarding ERISA preemption conflicts with state law,  Justice Scalia explained that "applying the "relate to" provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else."   *California Division of Labor Standards Enforcement v. Dillingham,* 519 U.S. 316, 335 (1997).

Justice Scalia went on to opine that " that our first take on this statute was wrong; … the "relate to" clause of the pre-emption provision is meant, not to set forth a *test* for pre-emption, but rather to identify the field in which ordinary *field pre-emption* applies— namely, the field of laws regulating "employee benefit plan[s] described in section 1003(a) of this title and not exempt under section 1003(b) of this title," 29 U.S.C. § 1144(a).  Id.

With these words in mind, Quincy now explains why the issue of ERISA preemption should be re-visited by this court, and why its ordinance does not trigger the doctrine.

A.  <u>Differences between Quincy REO and the Minnesota statute reviewed</u>

In the Minnesota case, upon which this court relied in setting aside the Fall River apprenticeship requirement, a contractors' association challenged a statute that applied to

public and private work in that state.  The statute required "all Minnesota sprinkler contractors to maintain an apprenticeship program approved by the Minnesota Department of Labor and Industry and to register all of their apprentices in the approved apprenticeship program. …Contractors without an approved program could not employ apprentices in the state." *Minnesota Chapter of Associated Builders & Contractors, Inc. v. Minnesota Dep't of Pub. Safety*, 267 F. 3d at 809.  To determine whether such a requirement could survive, the court explained it would "go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." Id. at 812.

The Minnesota court found that this rigid state-imposed standard, barring all contractors from working in the state unless they had an apprenticeship program that met state-imposed substantive requirements, necessarily implicated employee benefits – and thus ERISA - concluding that "the Minnesota statute, unlike the California statute, 'dictate[s] the choices facing ERISA plans.'" Id. at 814.

In distinguishing the case from the California statute analyzed in *Dillingham,* the Minnesota court acknowledged the distinction that Quincy presses here.

Quincy asserts that its apprenticeship requirement does not constitute a prerequisite to work in the city.  Rather, it merely provides that when Quincy acts as an awarding authority on its own construction project, it will limit the companies it considers for the work to those that participate in a state-approved apprenticeship program.  It applies to public work performed directly for the city, only, and does not address either private work within the city, or public work elsewhere. Compare *Cardinal*

*Towing & Auto Repair Inc. v. City of Bedford* 180 F. 3d 686, 692 (5th Cir. 1999)(it is the

promotion of general societal goals, not proprietary interests only, that is preempted).

This, Quincy asserts, renders its ordinance indistinguishable from the California

statute analyzed in *Dillingham*, as it is incentive based, and relates solely to those

occasions where the city is party to the project.  And, like the statute analyzed in

*Dillingham* the ordinance makes no reference to ERISA plans, and that is the case

because "approved apprenticeship programs need not necessarily be ERISA plans."

*California Division of Labor Standards Enforcement v. Dillingham,* 519 U.S. at 325.

Quincy's ordinance clears the "relates to" test, as it makes no reference to ERISA, and,

there is no allegation by any party to this case that Quincy's ordinance contains any

reference to the funding mechanism for the program.  It merely requires state approval.

Thus, for the very reasons that the Supreme Court found the California wage law in

*Dillingham* was not subject to preemption, this court should find that Quincy's apprentice

requirement is not preempted as well – to a point.

The *Dillingham* court further found – notwithstanding the foregoing – a benefits

requirement could be preempted if it has a connection with an ERISA plan.

B.  Application of *Dillingham* "connection" test

The Supreme Court posed the preemption analysis as follows:

A law relate[s] to a covered employee benefit plan for purposes of
§ 514(a) if it [1] has a connection with or [2] reference to such a plan.
Where a State's law acts immediately and exclusively upon ERISA plans,
...or where the existence of ERISA plans is essential to the law's
operation, that "reference" will result in pre-emption.

A law that does not refer to ERISA plans may yet be pre-empted if it has a
"connection with" ERISA plans. ...[T]o determine whether a state law has
the forbidden connection, we look both to "the objectives of the ERISA
statute as a guide to the scope of the state law that Congress understood

would survive, as well as to the nature of the effect of the state law on
ERISA plans.

Id. at 324-325 (internal citations and quotations omitted).  Applying the "connection
with" test to the facts presented here reveals the following.

### 1. Objectives of the ERISA statute

While concise application of ERISA preemption concepts has often proven
elusive, the purpose of the ERISA statute has never eluded clarity.   The statute, codified
at 29 U.S.C. § 1001-1461 (1994) "is a comprehensive statute that sets certain uniform
standards and requirements for employee benefit plans." *Wilson v. Zoellner*, 114 F.3d
713, 715 (8th Cir. 1997), quoting, *Arkansas Blue Cross & Blue Shield v. St. Mary's
Hosp., Inc.*, 947 F.2d 1341, 1343 n.1 (8th Cir. 1991), cert. denied, 504 U.S. 957 (1992).

The statute "was enacted in response to growing concerns about 'the
mismanagement of funds accumulated to finance employee benefits and the failure to pay
employees benefits from accumulated funds.'" *Carpenters Local Union No. 26 v. U.S.
Fidelity & Guar.Co.*, 215 F.3d 136, 139 (1st Cir. 2000), quoting, *Massachusetts v.
Morash*, 490 U.S. 107, 115, (1989).

In order to meet this important, overarching federal concern, the statute includes
express preemption language, designed to "ensure that plans and plan sponsors would be
subject to a uniform body of benefits law; [and to prevent] the potential for conflict in
substantive law... requiring the tailoring of plans and employer conduct to the
peculiarities of the law of each jurisdiction." *Minnesota Ch. of Assoc. Bldrs. &
Contractors,* 267 F.3d 807, 811 (8th Cir. 2001)(citations omitted).

In analyzing the preemption language, the *Dillingham* court had previously cautioned, "[a]s is always the case in our pre-emption jurisprudence, where "federal law is said to bar state action in fields of traditional state regulation, . . . we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *California Division of Labor Standards Enforcement v. Dillingham,* 519 U.S. at 325.

With those objectives in mind, we now analyze the effect of the ordinance itself on ERISA plans.

2. <u>Nature and effect of challenged ordinance on ERISA plans</u>

Quincy's apprenticeship provision requires only that (i) the contractor maintain and participate in a state-approved program, and (ii) it employ apprentices in accordance with the apprentice to journeyman ratio. It does not mandate how that program is funded and applies equally to ERISA-funded programs or those funded by employer's general funds. *California Division of Labor Standards Enforcement v. Dillingham,* 519 U.S. at 328. It does not mandate "employee benefit structures or their administration." <u>Id.</u>

Further demonstrative of this point is that the ordinance itself is structured in a manner that emphasizes the distinction between the interests governed: the apprentice training provision is contained within Section 15.26.010 (C); and the more traditional ERISA benefits are addressed in Section 15, 26.010 (E).

Finally, reversing the viewpoint on the issue one notes ERISA "has nothing to say" about "the standards to be applied to apprenticeship training programs" and nowhere within the act, or "its legislative history [can one discern] any intent on the part of Congress to preempt state apprenticeship training standards." <u>Id.</u> at 330-331. Apprentice

14

training is the very sort of activity which falls within the traditional police powers of the state, as evidenced by ERISA's silence on the topic, and the long history of state oversight of apprenticeship training programs.

Thus, the simple conclusion is that reached by the court in *Dillingham.* Preemption is not warranted on the facts presented, as the interests underlying ERISA, and those underlying the Quincy apprentice training requirement, are completely distinguishable.

For the foregoing reasons, Quincy should not be enjoined from enforcing this requirement of its Responsible Employer Ordinance.

## III.   MARKET PARTICIPANT

Finally, although the court did not accept the "Market Participant" argument asserted by Fall River, there are facts present here which warrant the conclusion that Quincy was in fact acting as a market participant.

A government actor is found to be a market participant when its actions serve its own needs rather then those of society in general.  Cardinal Towing & Auto Repair Inc. v. City of Bedford, 180 F.3d 686, 691 (5th Cir. 1999).  "The Supreme Court has found that when a state or municipality acts as a participant in the market and does so in a narrow and focused manner consistent with the behavior of other market participants, such action does not constitute regulations subject to preemption."  Id.

Here, the city makes no attempt in its ordinance to regulate private action, applying its provisions only to public works projects—when the municipality is purchasing goods and services for the creation of a public asset.  As in Cardinal Towing,

15

the City is procuring services that the City itself needs; it is not regulating the conduct of others. Id.

These reasons further militate against ERISA preemption, and in favor of the validity of the apprentice training requirement contained within the ordinance.


**CONCLUSION**

For all of the foregoing reasons, and those presented to the court at oral argument, the defendants respectfully request that this request for injunctive relief be denied.


By its attorney,


James S. Timmins  BBO # 547512
City Solicitor
City of Quincy
1305 Hancock Street
Quincy MA 02169
(617) 376-1511


DATE:   March 19, 2012

# EXHIBIT A

 

## CERTIFICATION CONCERNING
## RESPONSIBLE EMPLOYER ORDINANCE

It is hereby certified as a condition for bidding that the bidder and all subcontractors under the bidder shall comply with all of the provisions of the Quincy Responsible Employer Ordinance and with all amendments thereto.

Grasseschi Plumbing & Heating, Inc.
Name of Bidder or Sub-contractor

By: _____
Authorized Agent

James J. Grasseschi, President
Print or Type Name

00750-22

54.

 

## CERTIFICATION CONCERNING
## RESPONSIBLE EMPLOYER ORDINANCE

It is hereby certified as a condition for bidding that the bidder and all subcontractors under the bidder shall comply with all of the provisions of the Quincy Responsible Employer Ordinance and with all amendments thereto.

D'Agostino Assoc. Inc.
Name of Bidder or Sub-contractor

By: _____
Authorized Agent

Romeo D'Agostino
Print or Type Name