## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

MERIT CONSTRUCTION ALLIANCE,
   et alia
       Plaintiff

v.                                  Civil Action No. 12-10458 RWZ

CITY OF QUINCY

       Defendant

---

### AFFIDAVIT OF THOMAS P. KOCH

I, Thomas P. Koch, being first duly sworn, do hereby depose and state as follows.

1. I make each of the following statements of my own personal knowledge.

2. I am the duly-elected mayor of the city of Quincy, having first taken the oath of office on January 7, 2008; and, having been re-elected in 2009 and 2011. I am now serving my third term as mayor. I am well familiar with our city's Responsible Employer Ordinance, and many of the issues relating to it.

3. During my first year in office, I was forced to deal with a labor issue on a one hundred thirty million dollar construction project – the new Quincy High School. A dispute arose surrounding a bid submitted by D'Agostino Associates, Inc. – a plaintiff in this action. D'Agostino was a masonry contractor, and they were the low bidder on work to be performed at a very critical time in the project – installation of the brick finish. D'Agostino does not employ union laborers, and I was immediately notified by several of the union officials whose members were

working on the site that the presence of D'Agostino would cause, at the least, informational picketing – and would certainly result in further, significant delays.

4.  At that time, I instructed our city solicitor to investigate allegations against D'Agostino lodged by several union officials – allegations that, if true, would result in the rejection of the D'Agostino bid. Our investigation revealed that the allegations were not true, and D'Agostino was awarded, and completed, the job. When certain competing companies appealed our decision to award the contract to D'Agostino, the city participated in the bid appeal and defended our decision to award the contract to D'Agostino. Attached as Affidavit Exhibit A is a copy of the Bid Protest Decision issued by the Attorney General following its investigation of the matter.

5.  In addition to defending our award of the contract during the bid appeal, I began negotiations with union representatives to allow D'Agostino to work at the site without incident. I will acknowledge that I was primarily seeking to insure that this job continue to progress on time and on budget – but I undertook what were very difficult negotiations that resulted in D'Agostino's right to work on this project in 2008.

6.  As a result of this activity, which all occurred when I first took office, I learned much about our responsible employer ordinance – what was good and bad about it, and what we could do better. My administration undertook a two year review of the ordinance, submitting a newly written ordinance in May of 2010, that our City Council approved in June. A copy of that ordinance is attached to the Complaint as Exhibit A.

7.  This ordinance reflects concerns of our community that properly trained workers work on Quincy public works projects – which often involve dangerous work, and require skills that cannot be obtained simply "on the job."   That is where a dedication to apprentice training comes in – as it shows that a company is committed to having properly trained workers on the job.  In addition, a commitment to apprentice training insures a properly trained work force will be available as future projects come on line in the city.

8.  This commitment is especially significant in Quincy as my administration signed a contract on January 25, 2011 with a company that has committed to a $1.6 Billion redevelopment of our downtown  – a project that encompasses a build out period that will span this decade.   We began negotiation of the contract the first day I took office in 2008, and it was a significant part of our discussion during the responsible employer ordinance review.  Quincy, as a result of this contract, and its commitment of tens of millions of dollars in public funds, requires a trained, competent work force for years to come.  The requirement is real, and unique to our city as a result of our substantial investment in our downtown.  Apprentice training serves a critical role in insuring that our needs in this regard are met.  Although I wanted to see the ordinance applied to this project, I learned that the city might have a problem should it try to regulate the construction market in Quincy in that manner.  For this reason, we limited the scope of the apprentice training to public works jobs, only.

9.  I was also aware at the time that we would soon be starting our work on a new Central Middle School.  We began negotiating with the commonwealth's School

Building Authority in 2008 on this project, which would allow us to build a badly needed middle school. We have an opportunity to deliver this important project for the start of school in 2013; and we don't want to see that delayed for any reason.

10. Quincy has an inordinately high percentage of so-called "blue collar" workers. We have a number of union and non-union workers in our city, who are raising their families, using our schools and services, and paying the real estate taxes that fuel our local government. As I stated earlier, I have been on the campaign trail throughout our city three times over the past five years – each campaign has spanned the better part of one year. In addition, I am often out in the community as mayor. The single biggest issue I hear about is jobs.

11. Quincy has a substantial interest in seeing that its residents are employed, .and I believe that it is important that when the municipal corporation that is Quincy goes into the marketplace to undertake public works projects, paying in great part for these projects with taxpayer money, we do everything we can to insure that if an opportunity presents to employ a Quincy resident, contractors do so. This promotes the overall health of our community, for all manner of reasons that are obvious – some financial, such as insuring the fiscal health of our taxpayers – as well as many others. I find it ironic that the very basis for challenging our ordinance is the fact that our constitution protects the fundamental right to pursue employment. We are doing nothing more than that for our Quincy's residents. We know we need workers from outside Quincy. The new Quincy High School

would not have been completed without them. Our ordinance simply seeks to provide a proportionate opportunity for our residents.

12. The project that is the subject of this case is the construction of another badly needed school in our city, Central Middle School. The current Central Middle School was built in 1890, and was found to be in seriously deficient condition by the Massachusetts School Building Authority. This project is so important that the Authority voted to allow us to proceed on an expedited basis under its model school program. We are using plans from a middle school in Lynnfield, adapting them to Quincy, and saving millions in the process. The budget for the project is fifty million ($50,000,000.00) dollars. We are receiving state funds in an amount of slightly less than thirty-three million ($33,000,000.00) dollars. The taxpayers of Quincy are paying the balance.

I SIGN THIS UNDER THE PENALTY OF PERJURY THIS 19th DAY OF MARCH, 2012

Thomas P. Koch

# EXHIBIT A

# THE COMMONWEALTH OF MASSACHUSETTS

## OFFICE OF THE ATTORNEY GENERAL

ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

(617) 727-2200
www.mass.gov/ago

MARTHA COAKLEY
ATTORNEY GENERAL

March 3, 2008

In re:                                      )
                                            )        ATTORNEY GENERAL
City of Quincy                              )
High School Masonry Contract                )
                                            )        BUSINESS & LABOR
                                            )             BUREAU
Protestor:                                  )
                                            )        **BID PROTEST
Empire Masonry Corp.                        )          DECISION**
                                            )

## INVESTIGATION SUMMARY

Pursuant to M.G.L. c. 149, § 44H, the undersigned conducted an investigation of the captioned matter to determine if a violation of the bidding requirements for public construction had occurred. The Protestor, Empire Masonry Corp. ("Empire"), argued that the City of Quincy (the "City") should have rejected the bid of D'Agostino Associates, Inc. ("D'Agostino") for its masonry subcontract on its new high school project (the "project"). Empire claimed that D'Agostino committed fraud in the prequalification process by misrepresenting information about prevailing wage violations. Empire also claimed that D'Agostino's bid was "extraordinarily low" and raised an inference that the prevailing wage would not be paid on the project. Finally, Empire argued that

1

D'Agostino is not in compliance with the City's Responsible Employer Ordinance ("REO"). As part of this investigation, a hearing was held on February 15, 2008. Representatives of the City, Empire and D'Agostino attended and presented documentary evidence and testimony. Empire and D'Agostino presented pre-hearing memoranda. Post-hearing memoranda were submitted up to February 26, and the record then closed.

After investigation, I conclude, first, that D'Agostino did not commit fraud during the prequalification process. Secondly, I find that D'Agostino's bid was not unbalanced or front-end loaded and does not, on its face, demonstrate that the prevailing wage will not be paid on this project. The bid, therefore, is not unreasonably low. Finally, I find that the City reasonably concluded that D'Agostino was in compliance with its REO. The Protest is therefore Denied.

## STATEMENT OF THE CASE

This case involved the subcontractor prequalification provisions of M.G.L. c. 149, § 44D¾ and the City's REO. The prequalification law requires awarding authorities to prequalify filed sub-bidders for public construction projects exceeding $10 million. Prequalification is a two-step process, where the awarding authority reviews contractors' qualifications in Step One, and then invites only those who have met its qualitative criteria to submit bids in Step Two. Prequalification is done on a project-by-project basis by the awarding authority's "prequalification committee."

The City sought to prequalify general contractors and subcontractors for the project by establishing a prequalification committee. The entire project was estimated to cost $99,000,000, and the masonry subcontract was estimated to be worth $5,800,000. The City's prequalification committee issued a Request for Qualifications ("RFQ"),

2

soliciting Statements of Qualifications ("SOQ") from prospective bidders for the general

contract and the trade contracts in July 2007.

By law, the RFQ solicits information in four specific categories: (1) management

experience; (2) references; (3) capacity to complete; and (4) compliance with mandatory

requirements, including a commitment letter from a bonding company, a Division of

Capital Asset Management ("DCAM") Certificate of Eligibility and an Update

Statement. M.G.L. c. 149, § 44D¾(e) (governing prequalification of subcontractors). The

law specifies the number of points to be allocated to the first three categories; there are no

points for the fourth category, since the requirements are mandatory. The awarding

authority has the power to allocate points within the categories.  The statute also

establishes the minimum scores in each category and a total minimum score of seventy

points that a contractor must obtain in order to be prequalified.

Empire's case focuses on D'Agostino's response to Section VI(C)1 of the RFQ,

which relates to "management experience." By law, M.G.L. c. 149, § 44D¾(e)(1), that

category is worth fifty points, with a minimum score of twenty-five points being required

for prequalification. The City assigned five points to the "legal proceedings" subcategory

of "management experience." The SOQ read on Schedule E:

> Interested trade contractors are required to list each and every
> legal proceeding, administrative proceeding or arbitration
> currently pending and each and every legal proceeding,
> administrative proceeding and arbitration concluded
> adversely against it within the past 3 years as set forth
> in Section VI(C)(1)( e) of Part One of the RFQ for this project.

Section VI(C)(1)( e) of Part One of the RFQ stated:

> Provide information regarding each and every legal proceeding,
> administrative proceeding and arbitration <u>pending</u> against the
> Trade Contractor. In addition, provide information regarding

3

> each and every legal proceeding, administrative proceeding or
> arbitration <u>concluded adversely</u> to the Trade Contractor within
> the past three (3) years, which related to the procurement or
> performance of any public or private construction contract.
> (Emphasis in the original).

D'Agostino listed only one pending prevailing wage case, at the Oliver Ames High

School, as well as a case involving payment and change order disputes regarding the

Lewis Elementary School in Everett, Massachusetts on Schedule E of the SOQ. A listing

of 12 prevailing wage cases, including the Oliver Ames matter, was submitted with its

SOQ, however. The City, through its City Solicitor, gathered extensive information about

the prevailing wage cases during the prequalification process. Empire argued that

D'Agostino mischaracterized pertinent information about some of these cases and

therefore committed fraud during the prequalification process.

Empire raised three issues about D'Agostino's compliance with the REO: first,

whether it had a valid apprentice training program; second, whether it had health

insurance for all of its employees; and third, whether the past prevailing wage violations

raised the inference that the prevailing wage would not be paid on this project.

D'Agostino submitted a Sponsor Verification Form from the Department of

Apprentice Training ("DAT") in the bricklayer and construction craft laborer trades. This

form certifies that the contractor has an approved apprentice training program.

D'Agostino produced a letter from its insurance company that said:

> This letter is to confirm that the Medical and Dental
> benefits D'Agostino Associates, Inc. offers to it's (sic)
> employees under the D'Agostino Associates Inc.
> Employee Group Health Benefit Plan is administered
> by Health Plans, Inc...

4

At the hearing, D'Agostino stated that the plan was offered to all employees. Empire, however, produced affidavits from four former employees, who all stated that they were never offered or provided health insurance coverage. In response, Empire submitted certified payroll records ("CPRs") from recent projects in municipalities that have REOs.

Finally, D'Agostino argued that many of its prevailing wage complaints had been dismissed and that it only had minor, non-willful prevailing wage violations.

The City conditionally prequalified D'Agostino on November 26, 2007. The prequalification was conditional pending further information on the prevailing wage matters.[1] On December 26, the City received notice that the five citations issued by the Attorney General's Office in 2003 had been vacated by DALA.

On January 15, 2008, D'Agostino submitted a bid of $5,777,000 without alternates and $5,115,400 with all alternates; Costa Bros. bid $6,507,000 without alternates and $5,949,000 with all alternates; and Empire bid $6,544,000 without alternates and $5,948,000 with all alternates. On January 16, 2008 D'Agostino and the AGO reached an agreement under which two citations for failing to pay prevailing wage would stand and D'Agostino's appeals were withdrawn, a citation for failing to submit CPRS to the awarding authority was amended to an unintentional violation and D'Agostino's appeal was withdrawn, and two other citations for failing to submit CPRS to the awarding authority were vacated. One citation issued for failing to pay prevailing wage is still pending an appeal at DALA.

---

[1] The City was also going to provide D'Agostino with a second certification to sign. It appears this never happened. The City stipulated at the hearing that there is no need for further certification.

ANALYSIS

*I. Prequalification Fraud*

M.G.L. c. 149, § 44D ¾(h) provides that "[t]he decision of the prequalification committee shall be final and not subject to appeal except on the grounds of fraud or collusion." Empire has the burden of showing by a preponderance of evidence that D'Agostino engaged in fraud or collusion. See *IBEW Local 103 v. Everett,* Attorney General Bid Protest Decision, (November 2, 2006).

"Fraud" requires, by a preponderance of the evidence, proof of [1] a statement, act or omission relating to a material fact, [2] that has the natural tendency to be relied upon by or to influence the average person, [3] that is knowingly false or misleading, and [4] intended to mislead the prequalification committee or awarding authority. *IBEW Local 103 v. Everett, supra.*

Empire alleged that D'Agostino committed fraud in its SOQ when it listed one case as "pending," even though a citation had been issued, and another Connecticut case as "closed," even though fines had been assessed. I find that the first matter, which involved classification of work at the Oliver Ames School in Easton, Massachusetts, was in fact pending before the Division of Administrative Law Appeals ("DALA") at the time of the submission of the SOQ. The description of the matter as pending was correct. Furthermore, the only way a matter would be pending before DALA is if a citation had been issued. The City could therefore reasonably conclude from D'Agostino's submission that a citation had been issued. I therefore find that there was no fraudulent statement or omission regarding the Oliver Ames School.

With regard to the Connecticut matter, D'Agostino noted not only that the matter was closed, but also the fact that it was "unintentional." This would convey the message that a citation had issued, but that it was an unintentional violation. Once again, I find that no fraudulent statement was made by D'Agostino.

## II. Bid Price

D'Agostino bid $5,777,000 without alternates, $5,115,400 with all alternates; Costa Bros. bid $6,507,000 without alternates and $5,949,000 with all alternates; and Empire bid $6,544,000 without alternates and $5,948,000 with all alternates. The spread between D'Agostino and the next lowest bidder was $730,000. Empire argued that this difference in bids, which ranges from 12-16 % depending on what alternates are accepted, made D'Agostino's bid "remarkably low" and raised questions as to whether D'Agostino will pay the prevailing wage on the project. In this regard, Empire argued, D'Agostino's history of prevailing wage violations must be taken into consideration.

The Appeals Court has considered how awarding authorities should review an alleged ultra low bid in *Department of Labor and Industries v. Boston Water and Sewer Commission,* 18 Mass.App.Ct. 621 (1984). The Appeals Court found that an unrealistically low bid is not *per se* unlawful and there must be some manipulation of the bid process that gives the low bidder an unfair advantage over other bidders so that equal footing is compromised. *Boston Water and Sewer Commission, supra,* at 623.

In *Boston Water and Sewer Commission, supra,* the court rejected the claim of the Department of Labor and Industries ("DOLI") that the bid of Longo Construction, Inc. ("Longo") must be rejected simply because Longo had penny bid an item. The court stated:

7

> Here, Longo's bid was found by DOLI not to be "unbalanced,"
> "front-end-loaded" or otherwise artificially inflated. The fact
> that Longo bid a nominal amount for an item does not, by itself,
> invalidate the bid. Under G.L. c. 30 § 39M, the [Boston Water
> and Sewer] commission had the power to determine which
> bidder was the lowest responsible and eligible bidder. Its award
> of the contract to Longo must stand.

*Id.* at 626.

D'Agostino's bid was neither front-end loaded nor unbalanced. Empire presented

no evidence that the bid demonstrated on its face that the prevailing wage will not be

paid. D'Agostino explained that it based its bid on the City's plans and specifications,

which were similar to a project it had completed in Bridgewater. This supports the

legitimacy of the bid. Furthermore, the City's estimate in this case was $5,800,000 for the

masonry. At $5,777,000, D'Agostino's bid was close to the estimate. I therefore find that

the bid was not unreasonably low.


*III. Responsible Employer Ordinance*

The City has an REO that requires the bidder to agree in writing that it will, *inter*

*alia,* pay the prevailing wage; maintain or participate in a *bona fide* apprentice training

program; and furnish hospitalization and medical benefits. Pursuant to Section 15.26.4 of

the REO, all bidders must provide documentation that they are in compliance with the

ordinance prior to the bid opening.

D'Agostino argued that this Office is without jurisdiction to determine a bidder's

compliance with an awarding authority's REO. However, the filed sub-bidder certifies on

his sub-bid that he will "comply fully with all laws and regulations applicable to awards

of subcontracts subject to section forty-four F." M.G.L. c. 149, § 44F(3)(I). This is a

statutory requirement of substance. "(I)n matters of substance there must be strict

8

compliance with the requirements of G.L. c. 149, §§ 44A- 44L. *Chick's Constr. Co., Inc. v. Wachusett Regional High Sch. Dist. Sch. Comm.*, 343 Mass. 38, 41, 175 N.E.2d 502, 505 (1961). Accord, *Poorvu Constr. Co., Inc. v. Nelson Elec. Co., Inc.*, 335 Mass. 545, 552, 140 N.E.2d 891 (1957)." *Interstate Engineering Corp. v. City of Fitchburg*, 367 Mass. 751, 757 (1975).

The City's ordinance is a local law with which the bidder must comply. In addition, an awarding authority must comply with local ordinances unless it can point to some authority that allows the waiver of those ordinances. *Pile Drivers Local No. 56 v. Boston Redevelopment Authority*, Attorney General Bid Protest Decision (April 11, 2001) (case remanded to awarding authority to "ensure compliance" with ordinance requiring apprentice training program); *Boston Building & Bridge Corp. v. Boston*, Attorney General Bid Protest Decision (March 26, 1999) (case remanded to awarding authority for "action consistent with the provisions of its ordinance" requiring apprentice training program); *Letter to Robert Moran et al* (November 17, 1998) (matter remanded to Boston for the "purpose of compliance with the Ordinance"). It is therefore within our jurisdiction to consider D'Agostino's compliance with the REO.

Empire argued that D'Agostino is not a responsible bidder because it is not in compliance with the City's REO. First, it points to past prevailing wage violations and misclassification of workers in Massachusetts and Connecticut as evidence that D'Agostino will violate the REO and that D'Agostino is not a responsible employer. D'Agostino pointed out that five of the pending prevailing wage or misclassification citations were subsequently overturned by DALA. There are three unintentional citations for failure to pay the prevailing wage. I find that the City fully investigated these

9

prevailing wage and classification matters through its City Solicitor and concluded that D'Agostino was still a responsible bidder and in compliance with the REO. I find that it was not arbitrary or capricious for the City to make this determination, and therefore, its exercise of discretion will not be overturned by this Office. See *Capuano, Inc. v. School Building Committee of Wilbraham,* 330 Mass. 494 (1953) (absent arbitrary or illegal action by the awarding authority, its conclusions as to matters of fact cannot be controverted).

Secondly, Empire questioned the validity of D'Agostino's apprentice training program, due to low enrollment, low graduation rates and the listing of workers as apprentices when they were not. Empire acknowledged, however, that D'Agostino supplied a Sponsor Verification Form from the DAT dated August 6, 2007. D'Agostino correctly argued that questions about the legitimacy of D'Agostino's apprentice program belong before the DAT and not this Office. The submission of a valid Sponsor Verification Form from the DAT was sufficient to comply with the REO.

Thirdly, Empire questioned whether D'Agostino had in place, at the time of the bid, hospitalization and medical benefits as required by the REO. D'Agostino provided evidence of insurance coverage of "employees" in its pre-hearing submission of a letter from its insurance company and during its testimony at the hearing. Empire provided contrary evidence in the form of affidavits from four former employees who stated that they had never been offered or provided health insurance coverage. However, D'Agostino provided a list of employees on the insurance plan and also submitted CPRs from projects in cities with REOs which demonstrated that health insurance benefits had been paid.

10

For the foregoing reasons, the Protest is Denied.

Respectfully submitted,

Deborah A. Anderson
Assistant Attorney General

11